## EX-PARTE DENNIS EAGAN.

1. While it is within the jurisdiction of this court, under the statute, (Chapter 3129, Laws,) to award a *habeas corpus* and have a preliminary examination of a party arrested after affidavit and warrant, and discharge, commit to bail or remand into custody, still, the general rule is that this court should, under such circumstances, remand the party to the custody of the sheriff to be delivered to the magistrate issuing the warrant.

2. While in such case an affidavit of the party that he has reason to believe, and does believe, that he cannot get a fair examination or secure justice before such magistrate, coupled with the fact that two persons, charged with the murder with the aiding and abetting of which the prisoner is charged, and deemed by him to be essential witnesses, are confined in the jail of the county in which this court is sitting, are *not deemed sufficient grounds* upon which this court would have such examination; still, if the ground of the alleged belief be on account of alleged prejudice against the party, and the Attorney-General for the State consents to such examination on the ground that it will "save great expense to the State of Florida," this court will make such examination, and the testimony of witnesses may, in such case, by consent, be taken before a commissioner.

The petition for a writ of *habeas corpus* was filed in the Supreme Court February 15, 1881. The writ issued on same day, returnable before the court.

The petition represents that petitioner, Dennis Eagan, is confined in the county jail of Leon county by Alexander Moseley, sheriff of such county, without authority of law; that petitioner is informed that he is held under a warrant issued by one Witherspoon, a Justice of the Peace of Madison county, upon the charge of aiding and abetting the commission of a murder; it denies that he is guilty of any crime as alleged. The other allegations of the petition are stated in the opinion. It prays a writ of *habeas corpus* and an investigation by this court of the whole charge. Mr. Moseley, the sheriff, made return that he held under the

said warrant. This warrant, a copy of which accompanies the return, recites that affidavit has been made that on February 8, 1881, Charles Savage murdered Frank Paterson in Madison county, and that Eagan and one Howard E. James were feloniously present, assisting, aiding and abetting said Savage in the said murder. The warrant is endorsed by a Justice of the Peace of Leon county.

*E. M. Cheney* and *P. W. White* for the Petitioner.

Under the act of 1879, Chapter 3129, the writ of *habaes corpus* may issue at any stage of the proceedings after the detention of the petitioner under any process, and the court has original jurisdiction to inquire into all matters relating to such detention. Act of 1879, Chap. 3129, Secs. 1, 5, 6 and 7.

Having acquired jurisdiction, the court can determine every question arising in relation to the subject-matter. Hurd Hab. Cor., 331.

" The writ of *habeas corpus* is designed as a searching and inquisitorial process, and undoubtedly may be issued by a court of appellate jurisdiction, on sufficient showing, *at any period of the prisoner's confinement."* Hurd Hab. Cor., 333, 4 and 5.

The writ may issue before examination, and the court thereupon has power to pursue any course which the circumstances warrant. Krans' Case, 1 Barn. & Cres., *257 ; 26 Wend., 192 ; 4 Bacon's Abr., 576, Dr. Burns' Observations. In Krans' case, above quoted, the court recognized the power of examination before commitment, but declined to exercise it under the circumstances of that particular case.

Under the *habeas corpus* act of 1879, the Supreme Court, or the Judges thereof, can exercise all the powers of a committing magistrate. Exp. Harfourd, 16 Fla., 286.

The power of the court, under the writ of *habeas corpus*, to inquire into all the circumstances of the case is unlimited, except by its own discretion, and should be exercised to secure to the prisoner a fair hearing. Hurd Hab. Cor., 288.

Inquiry under *habeas corpus* may be made upon an arrest upon a mere warrant, either before or after commitment or indictment. Hurd Hab. Cor., 148; Street vs. State, 43 Miss., 17; Prime's Case, 1 Barb., 340.

" There has been a decided repugnance against making the writ less remedial than it was at common law, and the tendency has been in such cases to give the hearing on *habeas corpus* the character of an *original examination.*" Hurd. on Hab. Cor., 337.

Power under *habeas corpus* is to be exercised with reference to all the circumstances of the case. Hurd Hab. Cor., 347; Jurisdiction, Hurd Hab. Cor., 364; Jurisdiction Com. Law, Hurd, 415.

The authorities cited above seem to show conclusively—

I. That the Supreme Court, both under the common law and the statutes of this State, possess ample power under the writ of *habeas corpus* to exercise original jurisdiction over all matters relating both to the cause and manner of the detention of any person detained in custody charged with a criminal offence, and as the statute limits the inquiry to no particular form of process or cause of detention, it must extend to all.

II. That the extent to which the court shall exercise this power is a question entirely within the sound discretion of the court itself, depending upon the circumstances and necessities of each case; the court pursuing such course as the interest of the public, the ends of justice and the rights of the petitioner may require.

The main question in this case then is : Can the interest of the public, the ends of justice and the rights of the pe-

titioner best be subserved and protected, by remitting the examination to the magistrate who issued the warrant or can they best be subserved and protected by an examination before this court? What is the wisest and best course to pursue for the State and for the petitioner?

The petition shows upon its face that the petitioner cannot obtain a fair examination before the magistrate who issued the warrant.

There is no law of the State which authorizes the transfer of the case by any proceeding to any other magistrate; and therefore unless the matter can be brought on an investigation had upon *habeas corpus* before another court, the petitioner is entirely without remedy.

The petition shows that two important witnesses for the petitioner are now confined in the jail in this city, and, though not stated in the petition, it is a matter of public notoriety that these witnesses could not be taken to Madison without great difficulty and expense to the State. Either then the State must be put to a great expense and inconvenience to facilitate an object which might be as well accomplished here, or the prisoner must be deprived of important witnesses in the examination.

The statute of 1879 evidently intends to confer upon both the Supreme and Circuit Judges, under the writ of *habeas corpus*, all the original powers of committing magistrates, and no other reasonable construction can be placed upon its various provisions. The object was to give these courts concurrent jurisdiction, or either to enable them to assume jurisdiction to the exclusion of inferior magistrates whenever the ends of justice and the interest of the public require such action.

*John F. White*, State Attorney of the Third Circuit, and *George P. Raney*, Attorney-General for the State.

The petitioner is held under a warrant issued by a Justice of the Peace of Madison county for his arrest, and commanding that he be brought before the Justice of the Peace issuing it to be dealt with according to law. The warrant is regular in form, and is properly endorsed by a Justice of the Peace for the county of Leon, of which county the respondent is sheriff. Respondent holds him as sheriff of Leon county under such warrant. There is no traverse of his return.

He is not held "without lawful authority." The question is, does the statute (Chapter 3129) of 1879 propose or provide that the writ of *habeas corpus* shall be used to release a prisoner from a *lawful holding ?* The writ of *habeas corpus* was not originally, nor do we believe our statute is, intended to interfere with the lawful and ordinary course of judicial proceeding. The statute does not propose to give to every one under arrest on a criminal charge, and before there has been an inquiry or committal examination, the arbitrary right to remove the inquiry or examination from the magistrate issuing the warrant to a Circuit or the Supreme Court, or the Judge of one of these courts. Hurd, 331, 332, 333, 334.

Assuming that the statute, by its terms, gives the *power* to the court or Judge, before whom the writ of *habeas corpus* is returnable, to interrupt the proceedings of the Justice of the Peace before he has made an examination, and to finally dispose of the matter by committing without bail, or by requiring bail or by discharging the petitioner, we respectfully submit that such power should be exercised only upon the soundest discretion, and with such limitations as will give security against the abuse of this statute into a means of arbitrarily removing criminal examinations from Justices of the Peace to other tribunals. Kran's Case, 1 B. & C., 257 ; Ormalie vs. Wentworth, 65 Me., 129 ; Gorsline's Case,

21 How. Prac., 85 ; see Sec. 113, p. 904, Vol. 6, U. S. Digest, 1st Series ; Belgard vs. Morse, 2 Gray, 406.

Mr. Justice Westcott delivered the opinion of the court.

The petition in this case discloses that the petitioner has been arrested under a warrant by a Justice of the Peace after being charged upon affidavit with feloniously aiding and abetting the murder of Frank Paterson. No preliminary examination by the magistrate issuing the warrant followed its issuance. The petitioner here seeks an examination and proper order at the hands of this court.

The first question which it is suggested arises concerns the jurisdiction and power of the court. We have examined this question. We have no doubt of our power, under the statute of this State, to hear the evidence, and to commit, admit to bail or to discharge, as the facts may justify. In a case of this character, however, the exercise of this power is discretionary. The general rule, we think, would require us to commit the petitioner to the custody of the sheriff of this court, with directions that he be taken before the magistrate for the purpose of investigating the charge. Ex-parte Krans, 1 Barn. & Cress., 258. This rule, however, is subject to the exception that the court may, in its discretion •and for good cause shown, have the examination itself. It is suggested by petitioner that the petition here discloses good cause, in that it is alleged that he has reason to believe, and does believe, that he cannot get a fair examination, or secure justice, before the said Justice of the Peace in Madison county, and also because Charles Savage and H. James, two important witnesses of petitioner, are now confined in jail in Leon county, having been removed here for safe-keeping under the charge of the

murder which it is alleged petitioner is charged with aiding and abetting.

We cannot, in view of the results which must follow in the matter of the exercise of their jurisdiction by magistrates, establish the rule that upon the simple affidavit by a party arrested of reason to believe, and actual belief, that he will not get justice before the magistrate, we will arrest the exercise of his constitutional power and functions.   To do so would be to establish a precedent which would practically destroy his power as a committing magistrate.   The party should at least show by affidavit or otherwise some good reason for his belief, some good cause for this court, contrary to its general rule, to supersede the jurisdiction of this officer, and assume to ourselves functions which, under the Constitution and the general legislative policy of the State, belong to another.   Nor do we think the fact alleged as to the two witnesses sufficient.   Under proper process of law, their testimony, if admissible, may be had before a proper magistrate.   Again, from the nature of this case it is more than probable that persons, other than those charged with the crime, witnessed whatever occurred, and if this be true there must be witnesses for the State, resident in Madison county, to be brought here.   We cannot see from the pleadings before the court that there is any greater reason why the two witnesses for the petitioner should not be carried to Madison county rather than the witnesses for the State should be brought here.   We think this is a matter to be controlled to a great extent by the officers representing the State in this cause, and their views would very properly influence our action to a considerable degree.

Upon the present pleadings we must remand the case to the magistrate for investigation.

After the foregoing opinion was delivered, Mr. John F. White, State Attorney, and the Attorney-General, seeing that great expense would be saved to the State by having the examination before the Supreme Court, determined for this reason to consent to its proceeding with the case, and the Attorney-General so announced in open court, and the court thereupon decided to hear the case; and by consent of counsel for the State and the petitioner an order was entered authorizing John M. Beggs, Clerk of the Circuit Court for Madison county, to take the testimony of certain witnesses residing in that county, and report the same to this court.

The following testimony was taken by Mr. Beggs in Madison county; State Attorney John F. White, representing the State, and Mr. P. W. White, representing the petitioner, being present:

C. W. Stephens being sworn on behalf of the petitioner says: I live in Madison, Madison county, Fla.; I am an attorney-at-law; I know Dennis Eagan; I was in Madison on Tuesday the 8th February, 1881; I was with Mr. Eagan part of the morning of that day; Mr. Eagan was acting as Notary Public in taking testimony in the case of Bisbee vs. Finley; Mr. S. Y. Finley and myself represented Mr. Finley in taking testimony; one witness had been examined and cross-examined, and another witness was just called to go on the direct examination when Mr. Eagan said we would not take any more testimony here; I think this occupied about three-quarters of an hour; Mr. Horatio Jenkins was representing the contestant, Mr. Bisbee; Mr. Eagan was recording the testimony, and I was also taking a copy of the testimony; there was firing of pistols in the far end of the room; I presume caused him to get frightened and desist; I was sitting with my back towards the firing when I first heard it on the east side of the table

next to the door ; Mr. Finley was sitting on the same side of the table on my right; Mr. Eagan was sitting opposite me on the other side of the table with his face to the door, when we began taking testimony ; Mr. Jenkins was sitting at the north end of the table with his face towards us ; the witness who had been on examination was a little to the left of Mr. Jenkins, about east of the north end of the table; the remark made by Mr. Eagan, that he would take no further testimony, was after the shooting was over and I had gone down and returned to the court room; Mr. F. P. Paterson came in the room whilst we were taking testimony and sat down by me, and I did not notice when he got up and left me ; it was about fifteen or twenty minutes after he came in until the shooting occurred ; while sitting by me I think he was reading some testimony that was taken the day before on the Eagan plantation in the same case, or rather a copy of some testimony ; I did not see the commencement of the shooting ; immediately after hearing the reports of the pistols in quick succession I jumped up and saw Howard E. James and Charles H. Savage and F. P. Paterson all together near the door of the court room ; I saw Paterson as though he seemed to be pulling off from the two negroes, Savage and James ; I left my seat and ran towards them as fast as I could ; by the time I got there Mr. Paterson had fallen and gotten up again ; I had to look where I was going, as I was jumping from one bench to another to get to where they were standing, and made some noise going over benches ; Savage was standing about six or eight feet from the door in the court room ; I had heard distinctly three reports of a pistol before I got to them ; when I was on the last bench, about five feet of Savage, who was in front of me, he leveled his pistol at me and said, " don't you come here ;" I said, "don't you shoot me, sir," and immediately jumped off the bench and went

to Mr. Paterson, who had just gotten up; I asked him, "what is the matter, Frank;" he answered, "I am shot;" I then asked him if he was hurt much; he answered, "yes, I am killed," and put his left hand up to his breast; we then walked by Savage and James, and I assisted him down stairs, where he got on a bed in a room down stairs; I then immediately went back up into the court room with the intention of seeing that the parties did not escape; by the time I got in the court room, Mr. Pollard, the town marshal, came in, and some one on the outside locked us up in the court room; there were present in the room then Mr. Finley, Mr. Eagan, Mr. Jenkins, Mr. Pollard, the two negroes, Savage and James, a negro by the name of Burk Stevens, who had come up after the shooting, I think, and myself, were all that I remember that were locked up in the room; we were awaiting the arrival of the sheriff with his posse; at the time the shooting occurred I think there was in the room Mr. Florrid, but he went down ahead of us; Mr. Church had been in the room; I do not remember seeing him after the shooting, until I came back in the court room; if I remember right he was guarding the door; I did not see Mr. Eagan after the shooting commenced, until after I had come back from down stairs; the last I saw of him before I went to the parties he was sitting at the table before I got up; I was busy looking over a list of witnesses for the name of one who had been called for the contestant; when I got up and went to Mr. Paterson my impression is that Eagan and others were within the bar; I do not know that Mr. Eagan followed me, none that were engaged in the examination followed me out of the bar that I know of; my whole mind was fixed upon Paterson's danger; I do not remember hearing Mr. Eagan say anything, or any other person say anything more than I have related; Mr. Savage and James had both been in front

part of the court room ten minutes before the shooting, but they had disappeared from the bar, but I do not know whether they went out of the court room or not, and do not know of Mr. Eagan sending them out on any errand whatever; the examination up to the time of the shooting was conducted in a perfectly quiet and orderly manner; Mr. Eagan did not take any part in the difficulty that I saw.

Cross-examined by the State:

Mr. Eagan did not do anything to prevent the difficulty that I saw after it was commenced; I do not know that he got up off his chair until after I left the room with Mr. Paterson; my impression is that Eagan, Savage and James were inside the bar when I came up from below, but I know that after that, while we were locked up waiting for the sheriff, Savage and James walked round in the room with their pistols in their hands; I saw James reloading his pistol inside the bar near where Mr. Eagan was standing; Mr. Eagan did not expostulate with him against reloading his pistol in my hearing; I did not hear Mr. Eagan at any time speak to Savage and James in condemnation of their shooting of Paterson from the time he was shot until Eagan left; Mr. Paterson, while in the room prior to the shooting, conducted himself in a perfectly quiet and peaceable manner; there had not been any demonstration made either by Mr. Paterson or his friends to prevent from first to last the taking of the testimony prior to the shooting; when I heard the first of the shooting I presume I must have been greatly excited; there was considerable noise and confusion in the room; I do not remember what any person said, except what I have related, while the shooting was going on; there were five hundred and something more names on the paper I was looking over when the shooting began, which was a list of contestant's witnesses, and all

that I knew were negroes; the testimony of Charles Savage was taken the day before the killing, and was completed on that day, and was the only testimony taken on that day; the testimony was taken on the Eagan plantation two and a half miles from town, in an out-house in the yard of Dennis Eagan; I do not know why he (Savage) was in the court-house on the 8th, as his testimony had been taken and completed the day before; I was very well acquainted with Savage prior to the time as to which I have been deposing, and also with Howard James; they had both been absent from this county some time, perhaps two months; I saw them in Jacksonville during the time; I am personally acquainted with Mr. Eagan; he claims to be a citizen of Madison county; he votes here, I know; he had been absent for some time, in fact I think I have not seen him here since the November election, until a few days before Paterson was killed; Mr. Eagan said he was acting as Notary Public in taking testimony, and that he received his appointment from Governor Drew just before he went out of office; he showed his commission to Mr. Finley.

*Question*—Do you know of your own knowledge, or from Mr. Eagan's statements, why evidence in the contested election case of which you have deposed was taken at Eagan's plantation, and not at the court-house?

*Answer*—I do not know of my own knowledge; General Jenkins remarked in the presence of Mr. Eagan that it was because they could take better care of the witnesses at the Eagan place.

*Question*—You have stated that you are well acquainted with Eagan, Savage and James. Do you know what the character of their relations were?

*Answer*—I consider them on very friendly terms; they were of the same political party. I have seen them together; I do not remember how often.

There is but one door to the court room in the east, and about fifty or fifty-five feet from where I was sitting when the firing commenced ; the position Mr. Eagan was sitting in gave him a full view of all the space between him and the door.

Mr. Eagan was in the court room I think some time before I was; General Jenkins came up about the time I did ; Mr. Eagan took his position at the table prior to my taking mine; General Jenkins could have seen all that was going on at the door from the position he took at the table; Mr. Finley and I could not have seen without turning round ; as well as I remember I turned around as soon as I heard the report of a pistol; I heard three reports in quick succession ; there might have been four, I would not be positive; at the time Savage leveled his pistol at me, and I told him not to shoot me, all the shots had been fired at Mr. Paterson that were fired at all; I am certain there was no shooting after I told him not to shoot me ; the negro Burk Stevens, after coming in the room and the door was locked, was very boisterous, and seemed to be very uneasy and anxious to get out; he went to the window, on the south side of the room next to where the colored people were congregated, and had conversation with them, but I do not know what he said ; there were over one hundred colored people assembled in the street around the courthouse, mostly from the country, and not from the town ; at the time Burk Stevens went to the window the negroes outside the court-house were very much excited.

*Question*—Did Mr. Eagan, when Burk Stevens was talking to the colored people from the window, remonstrate with him in any way to allay the excitement of which you have deposed ?

*Answer*—He did not.

When I came back up stairs into the court room Savage

and James had out their pistols, and at first refused to submit to an arrest; I did not urge them to submit, and do not know whether Mr. Finley did or not; I was then prepared to force them, as I had carried a pistol with me on going up stairs the second time.

I joined in the posse after getting up there that made the arrest; Mr. Eagan did not aid in making the arrest after the killing of Mr. Paterson, neither did he advise them, Savage and James, to surrender as I know of; I do not know whether Dennis Eagan was armed on that occasion or not; the prime cause of the suspending the taking of testimony then and there was the excitement growing out of the killing of Paterson.

Redirect examination:

I had no conversation with Eagan after I came back up stairs after the shooting; Mr. Eagan appeared to be very much excited, particularly after the sheriff's posse had gone up there some time after the shooting; there was a few words spoken to him by one of the posse, other than that I know of nothing that should excite him or scare him; he, one of the posse, cursed him, but did not make any threats that I know of; there was no gun presented at Mr. Eagan that I saw; there was ample opportunity to have shot him by the party that cursed him, if he had desired to do so; the sheriff and others interfered and stopped the cursing; I don't remember that Eagan went to the window and called to the sheriff to come up after the door was locked; I did not see that; the sheriff went up with the posse; there was no attempt made to arrest these parties before the sheriff went up with his posse; I do not think it was more than five or ten minutes from the time of the shooting before the sheriff arrived with the posse; it possibly might have been fifteen minutes; I did not pay much attention to Eagan during this interval, but am in-

clined to think he was behind the bar walking about, but he may have been sitting during the time.

*Question*—What was the behavior of the other parties during that interval who were locked up in the room?

*Answer*—They were like me, I guess, awaiting developments; I do not remember hearing Mr. Eagan say anything at that time of any intended attack upon Mr. Paterson.

C. W. Stephens sworn for the State says: I was present at the election in Madison November 2, 1880, as one of the inspectors at Poll No. 2; during the day I saw Paterson, Eagan and Charles Savage, but not Howard James; I do not recollect seeing him, but think he was present before we completed the count; Mr. Paterson was a very ardent supporter of the Democratic ticket, and worked very hard for the nominees; Mr. Eagan and Savage were leaders in the Republican party in this county; Mr. Savage was one of the nominees for the Assembly by the Republican party; Mr. Eagan was a very ardent supporter of Savage as well as of the whole ticket; I did not on that day see any crimination or disturbances between said parties, but next morning very early, just after completing the count of the votes, there were some words passed between Eagan and myself, I think relative to a paper which Mr. Eagan desired to read to the inspectors; there were some words passed between Mr. Eagan and Paterson I think relative to that; I have forgotten what the words were, but I remember Mr. Paterson stated something about its being a hatched-up matter; I remember his using the words " hatched-up ;" he and Mr. Eagan had no kind feeling for each other, which this conversation indicated; this took place about daylight in the morning; when Mr. Paterson came into the court room the morning he was killed, Eagan and he did not speak to each other to my knowledge; I was pres-

ent and heard and copied the most of the testimony which Savage gave in the contested election case at the Eagan plantation the day before Paterson was killed; part of his testimony referred very materially to Mr. Paterson.

*Question*—Were those material allegations touching Mr. Paterson, to your knowledge, true or false?

*Answer*—Knowing Savage well, and also knowing Mr. Paterson well, and seeing Mr. Paterson's conduct during the day of the election, I believed that Mr. Savage testified falsely; I knew Mr. Paterson well, and regarded him as one of the most unoffending, amiable and most peaceable young men of my acquaintance in this or any other community.

I cannot state whether the witness whose name I was looking for came into the court-house; I don't remember that I saw him; I mean the second witness; the first witness whose examination had been completed I am of the opinion left the room, for I saw him start out before the shooting.

W. N. Densler being sworn deposed as follows: I reside in Madison, Fla.; my occupation is a merchant; I was in the court-house about the 8th February, 1881, at the examination of witnesses in the contested election case between Bisbee and Finley; I saw Mr. Frank P. Paterson in courthouse that day; he was sitting at the table inside the bar, I think reading some testimony; I don't think I saw him there more than one minute; I had just got in when he handed the testimony to Charles S. Church that he was reading; I sat down to read it with him, Charles Church; I do not know what became of Mr. Paterson at the time, suppose he got up to go out; I was sitting just outside of the bar, on second bench, and Church was sitting in front of me on the first bench; I did not see Mr. Paterson any more until after the first pistol was fired; when I heard

the first pistol fire I jumped up off the bench, saw Charles Savage with his left arm around Frank Paterson's neck, and about that time I saw the second shot fired; saw the flash of the pistol of Charles Savage; in a very short while Paterson tore loose from Savage, and just as he tore loose from Savage and started to stumble I heard the third shot, but saw no flash; Mr. Frank Paterson fell on the floor; I don't remember whether he was helped up or got up by himself; he was taken by the arm by some one and led out at the door; Charlie Church, deputy sheriff, ordered no more shots to be fired in the house, and ordered Savage and Howard James to surrender and give up their pistols; Savage and James swore they would die before they would be arrested; Savage and James both had their pistols drawn all the while I was in the room; Savage and James both retreated back towards the bar where Eagan was, and when they got back to where I was, being between them and Eagan, Mr. Pollard, the town marshal, ordered Mr. Church to close the door to keep them from going out and to keep others from coming in; just at that time I left the room; I do not know what Mr. Eagan was doing, more than sitting at the table, as I had just gone in; I did not notice Mr. Eagan from the time the pistols fired until Mr. Paterson was led out at the door after he was shot; I never looked behind me but once; the firing of the pistols was the first knowledge I had of the difficulty; Savage and Paterson were about two or three feet from the door when I first saw them; I did not notice James at the time; I suppose the intervals between the reports of the pistols was about the time it would take to count four or five; Savage and Paterson separated after the second fire; no one got to them, but Charlie Church got near there; Savage and Paterson were near the length of the room from Eagan when the firing commenced; I do not know whether Ea-

gan said or did anything on that occasion or not; I did not hear Eagan say anything; I did not hear Mr. Eagan say anything to Savage, James or Paterson; I was sitting about ten or twelve feet from Mr. Eagan at first; I do not know whether he moved or not; I was sitting very nearly between Eagan and the parties shooting when I first heard the pistol report; I did not advance towards Savage and Paterson until the firing ceased; I only stood up and turned around, facing them; I suppose I was about 35 or 40 feet from Savage and Paterson when the firing commenced; when the firing occurred I think there was in the room myself, C. W. Stephens, Charlie Church, Howard James, Mr. Paterson, Charles Savage, Mr. Eagan, Mr. Finley and Mr. Jenkins, are all that I can remember being in the room, but others came in after; I do not remember seeing Mr. Florrid in the room.

Cross-examination by the State:

From the time I jumped up and turned around, when I heard the pistol fired, my attention was mainly directed to the combatants; from the time I got up I was looking at them until the firing was all over; I do not remember hearing anything said behind me in the bar until after the firing ceased; during the time of the firing I was intensely engaged in what was going on in front of me; after the firing ceased I heard Mr. Finley say, "for God's sake disarm those men;" that was all I heard from any one behind me in the bar; if Mr. Eagan said anything I did not hear him; Mr. Finley was on his feet when he spoke; I do not remember seeing Mr. Eagan at that time; neither do I recollect seeing Mr. Jenkins at that time; Mr. Eagan was the only citizen of Madison county that remained behind the bar after the firing commenced; Mr. Stephens and Eagan were the only citizens of Madison county behind the bar that I remember when the firing commenced, and Mr.

Stephens ran immediately to the combatants; I do not know that Mr. Eagan changed his position at that time at all; when the firing commenced I suppose the parties were about forty feet from me, and when it ceased they were about thirty feet from me; Charles Savage fired the second shot; I saw him shoot it and the flash of his pistol; I am satisfied he did not fire the third shot; from the shots being in the room I could not tell from what direction the sound came, nor did I see the smoke or flash from the third shot; Paterson had just torn loose from Savage, and was stumbling or falling when the third shot was fired; judging from the position James was in when the firing ceased, Paterson was nearer him than he was when the first or second shot was fired; Mr. Paterson was not making any resistance or assaulting either of the parties when the second and third shots were fired, but was trying to get away; from the position Savage occupied, held his pistol when the second shot was fired, the ball would have entered Paterson's breast; after the shooting, when James and Savage had their pistols in their hands, when they were ordered by the deputy sheriff, Church, to surrender, and swore they would die before they would be arrested, Mr. Eagan did not in my hearing say anything to induce them to surrender; I did not hear Mr. Eagan tell Savage and James to give up their pistols, when they were ordered to do so by the deputy sheriff; the order of the deputy sheriff to them to surrender and give up their pistols was made in the presence of Mr. Eagan, and loud enough for him to have heard the order; Eagan was about thirty feet from the deputy sheriff when he made the order for Savage and James to surrender and give up their pistols; Savage and James were at the time about five or six feet from the deputy sheriff; this occurred immediately after the firing; Mr. Paterson had left the room at the time these orders

were made by the deputy sheriff; from where Eagan was sitting at the table when I went in he had full view at the door; the conduct of Mr. Paterson, while I saw him in the court room in the bar, was peaceful and respectful to those therein; Eagan's conduct was also peaceful and quiet to those therein, so far as I saw; Mr. Eagan did not speak to Mr. Paterson in my presence at all; Mr. Paterson was remarkable for his peaceable and quiet disposition in this community; I have known him since the fall of 1876.

B. F. Moseley being called and sworn for and on behalf of the State, states as follows: I reside in Madison county, and am a clerk in John L. Inglis' store; I am acquainted with Dennis Eagan.

*Question*—Did you ever have any conversation with Mr. Eagan in regard to the action of certain parties touching the election of 2d of November last; if so, state what was said by him, and when and where it was?

*Answer*—On the morning after the election Mr. Eagan came in the store where I was; he was talking about the election, and pulled out a memorandum book and said he had all their names down; said they have had their day, and I intend to have mine; I don't remember all the conversation, but the above is about the substance of it; it was given in rather a threatening manner, and I understood it to be threatening to the names in the book; I did not see the names, and do not know whose names were in the book; he appeared to be very much disturbed about the way the election had gone; I am certain he said they have had their day, and I intend to have mine; these words were said in a threatening and angry manner.

*Question*—Did Mr. Eagan continue to reside in Madison county after that date?

*Answer*—I am satisfied he did not so continue to reside, but left for Jacksonville that night, and I have not seen

him since ; I understand Mr. Eagan has business in Jacksonville in the Revenue Department; I am acquainted with Charlie Savage and Howard James ; they were citizens and voters of this county at the last election.

*Question*—Do you know whether they absented themselves from the county soon after the election, and if so, where they went to ?

*Answer*—I do not know of my own knowledge that they left the county only from hearsay ; I do not recollect seeing either of them in the county since the election to the present.

Cross-examination :

I do not know that Mr. Eagan has changed his residence and citizenship from this county to Jacksonville.

*Question*—What do you mean in your direct testimony by the expression, " I am satisfied he did not continue so to reside, but left for Jacksonville ?"

*Answer*—I mean that I thought he returned to Jacksonville to take charge of his office as U. S. Revenue Collector.

John Brady sworn on behalf of the State says : I reside in Madison county, Fla. ; I am a farmer by occupation ; I am acquainted with Charles Savage, Howard James and Dennis Eagan.

*Question*—If you have had conversation with them, or either of them, about F. P. Paterson prior to his death, state what was said and where and when the conversation occurred ?

*Answer*—I had a conversation with Charles Savage at Jacksonville, I think about the 1st of January last; he was speaking of coming back to Madison ; he said he expected to come back to Madison, and he thought he might have some trouble, but if he did he was coming prepared to defend himself ; he said he did not propose to be treated as

he had been treated in Madison by some few any longer; he mentioned the names of a few; he told me about a cursing I gave him, and Mr. Hankins; he said he did not think much of it, as he thought we were drinking; he said Mr. Frank Paterson, Mr. Forester and Mr. Waring had been making some threats about him, but if either of them got the advantage of him they would have to be mighty quick to do it; James was not present.

*Question*—Was Mr. Eagan in Jacksonville at this time, and present at this conversation?

*Answer*—I did not see Mr. Eagan in Jacksonville, but understood he was in Jacksonville sick at the time; he was not present at the conversation; I saw James in Jacksonville about that time.

P. S. Coggins being sworn states as follows: I reside in Madison county, State of Florida; I am a clerk in a dry goods store; I know Charley Savage, Howard James and Dennis Eagan, and knew F. P. Paterson in his life time; I saw Eagan, Savage and James all together a short time before Mr. Paterson was killed; I saw them together on the morning of the 7th February, 1881, and Mr. Paterson was killed on the 8th; they were together at the Madison depot, and saw them walk up the railroad to the crossing, which is about 70 or 80 yards; they stopped at the railroad crossing and talked together about ten minutes; this crossing referred to is west of the depot, about 70 or 80 yards.

*Question*—Was there any other white man present at the crossing where this conversation occurred between Eagan, Savage and James?

*Answer*—There was none; Mr. Jenkins was standing off where the buggy was; Eagan, Jenkins, Savage and James came on the train from Jacksonville that morning; the train was rather late arriving that morning.

*Question*—Was the crossing at the depot more public than the crossing where they had the conversation to which you deposed?

*Answer*—It was more public.

I noticed that Savage and James had arms; each one had a gun in his hand as much like this one I hold in my hand as I ever saw; they are called Springfield army cavalry rifles; they are breech-loaders; I do not know whose gun this is I hold in my hand; I find it in the custody of the sheriff, he being now present; I cannot swear that this gun is one of the guns I saw that morning; it resembles them exactly.

Cross-examination:

The crossing where the conversation occurred is west of the depot in the direction of Eagan's house from where he got off the train; when the conversation broke up Eagan got in his buggy, he and Jenkins, and went in the direction of his house; Savage and James went down the railroad in the direction of where Savage lives.

John B. Brinson being called and sworn on behalf of the State says: I reside in Madison county, Fla.; am a clerk in Captain Inglis' drug store; I am acquainted with Dennis Eagan, Charles Savage, Howard James, and knew Frank Paterson in his life time; I was at the Madison depot on the morning of February 7th just when the Jacksonville train came in; I saw Eagan, Savage and James that morning after they got off the cars.

*Question*—Did you notice anything unusual which attracted your attention to the parties, if so, state what it was?

*Answer*—They each had a gun; Mr. Eagan had a double-barrel breech-loading shot-gun; the guns Savage and James had, as well as I could see, were like the gun I see there in the custody of the sheriff; Mr. Eagan put his gun in Mr.

Tidwell's wagon, which wagon went out towards the Eagan place where Tidwell lives; Eagan then walked up the railroad with James and Savage; I saw them in conversation; saw no one else in the conversation but Jenkins, and am not positive that he was; I don't remember whether Jenkins walked up the railroad with them or not; the gun Eagan had looked to be a new gun.

Cross-examination:

I do not know what Eagan, James and Savage were conversing about.

*Question*—Did you ever see any other white man have a new breech-loading double-barrel shot-gun?

*Answer*—I have.

*Question*—Did you ever see any other negroes have guns in this county?

*Answer*—I have.

Redirect examination:

*Question*—Did you ever see two negroes in this county get off a train before each armed with a breech-loading army cavalry Springfield gun like the one now shown you?

*Answer*—I never did before that morning.

Edmond Burroughs being sworn on the part of the State says: I live in Madison, Madison county, Fla.; I belonged to B. P. McLeary before emancipation; I have no particular occupation; I job about at any kind of work for a living. The witness was handed a breech-loading army Springfield rifle now in the custody of the sheriff, and asked if he knew that gun; answers I do. Howard James left the gun at my house the night before Paterson was killed; Charlie Savage also left a gun at my house; his gun was about the same length of this, but not exactly like this; it shot oftener; they stayed all night at my house that night; I know Savage's gun shot oftener because I

have shot it before that time; it was his own gun; he had owned it two years or longer; there was no other guns left at my house at that time, nor no other time; I think the guns were loaded, but do not know for certain, for I did not examine them; the gun Savage left was a breech-loader; just after the fracas commenced Charlie Savage's father called at my house for the guns, and I gave them both to him; Savage and James had been carried to the jail when old man Amos Savage got the guns; Charlie Savage and Howard James came to my house early in the night before the killing of Mr. Paterson; it is about two miles and a half out to the Eagan place; it is about three hundred yards from my house to the colored school-house; that school-house is between here and Eagan's place; the school-house is in sight of John L. Miller's house; he (Miller) lives in the corporation, so is the school-house.

Cross-examination:

I reckon my house is about three-quarters of a mile from the court-house, but I don't know; I live in the corporation; I never saw this gun until the night James left it at my house.

*Question*—How old was the gun James left at your house?

*Answer*—I don't know when it was manufactured.

*Question*—Is there any particular mark or make about the gun you have testified about as having been left at your house by James by which you can identify it as the same gun here?

*Answer*—It looks like the same gun; it has a blue barrel and is a new gun; it was a short gun like this; it is the same gun I gave to Mr. Hankins, the sheriff; I did not examine the gun the night James left it at my house; I did not examine it the next morning.

Redirect examination:

The gun that James left at my house was a new gun; looked like it had never been shot, and had a blue barrel.

S. M. Hankins sworn on the part of the State says: I am sheriff of Madison county, Fla., and was on the 8th February inst.; this gun I have in my custody I took from Edmond Burroughs; I think it is known as a Springfield cavalry army rifle; it is a breech-loader, and shoots Cartridge No. 45; it was loaded when I took it from Burroughs; I took the gun on the 8th February, the day that Paterson was shot; I have been handling guns since I was eight years old; I cannot say positively whether it had ever been shot or not, but from the looks of the gun I thought it never had; it is a new gun; when I got the gun the tallow that is used in packing new guns for shipment was still to be seen on the breech and muzzle of the gun; from my knowledge of fire-arms I consider this a very deadly weapon, and one that can be fired very rapidly; I found some cartridges in Howard James' coat-pocket that fits this gun; I found the cartridges after Paterson was killed; the cartridges would not fit any other gun that I could find; there has been five military companies here and the cartridges would not fit any of their guns; I arrested Savage and James after Paterson was shot; the arrest was made in the court room; when I first entered the court room they were standing between the table and the judge's stand; Mr. Eagan was on the side of the table they were, and Mr. Jenkins was at the north end of the table; Savage and James each had a pistol in the hand at the time; I thought at first, from their actions, they did not intend to give up; I then told Savage that I had a warrant for him, and said I was going to arrest him; I went ahead of the posse; he met me and asked me to protect him, and handed me his pistol; James walked across the floor for perhaps a minute with pistol in hand, myself and Savage

between him and the posse; he finally gave his pistol, I think to the town marshal, Mr. Pollard, who handed the pistol to me, and surrendered; Savage's pistol was a large British bull-dog self-cocking pistol, carried a Cartridge No. 44; it is a five-shooter; it is not a new pistol; the pistol taken from James is a small nickle-plated new five-shooter; shoots No. 32 cartridges; when I got the pistol from Savage it had but one empty shell in it, the other chambers were loaded; the pistol taken from James was fully loaded, but had been snapped, as the pistol showed, by the indention on the cartridge.

*Question*—Do you know whether their pistols had been reloaded after Paterson was shot, and if so, how do you know it?

*Answer*—Howard James said to me in the presence of Mr. Eagan, "you know I did not shoot for my pistol is all loaded;" he ran up to me in the excitement and said, "what do you want with me, I did not shoot, my pistol is all loaded," and repeated this several times on the way to the jail; about the time we got to the jail Savage said, "hush, Howard, you reloaded as I did;" Howard remarked, "I did not shoot;" I said to Savage, "one barrel of your pistol is empty;" he said, "no sir, I shoved all the empty cartridges out with Mr. Eagan's pen-holder and reloaded;" I examined the wound in Mr. Paterson's left hand; the wound was on the finger next to the little finger; it was shot right through; from my knowledge of fire-arms it was impossible for the wound to have been made by a ball from Savage's pistol; I think as large a ball as Savage's pistol carried it would have cut off the finger; the wound was a round hole through the finger, looked like it might have been made with a buck-shot; Mr. Paterson had a very small finger; I don't think the ball tore out on either side of the finger, but went right through the

finger; when I came to make the arrest there was a large crowd of excited people around the court-house; I placed a guard at the door to keep the negroes from going up stairs uutil I made the arrest; some of the negroes were armed; I saw one double-barrel gun, and some of them had sticks; Burk Stephens' wife was in a wagon with a gun calling to the crowd to come on and show themselves as men; the wagon that Burk Stephens' wife was in was about twenty feet from the court-house door; I do not know whether that wagon left when Mr. Eagan left or not; I did not see Mr. Eagan when he left; I saw a crowd running in the direction of the colored school-house, and Burk Stephens' wagon with them; I did not see Eagan in the crowd; I was about one hundred and fifty yards from the crowd; there was a warrant placed in my hands for the arrest of Eagan that P. M. at half-past five o'clock; I got to his place about or near dusk; I did not arrest him, as I did not find him; I searched for him; I never saw Mr. Eagan any more after the day of the killing of Paterson until I saw him in jail in Tallahassee.

Cross-examination:

I do not know Mr. Finley; do not know whether he was in the room or not; I saw in the room Mr. Pollard, C. W. Stevens, a negro by the name of Burk Stephens, beside Jenkins, Eagan, Savage and James; when I went in to make the arrest, Burk Stephens was at the window on the south side of the house; C. W. Stevens and Pollard were on the north side of the house outside of the bar; I was excited and might have overlooked others in the house; I kept my eyes on Savage and James, as they had pistols drawn; Savage and James were about ten feet from where Eagan was standing, who was a little to the north of the centre of the table on the west side of the table; Savage and James were about the middle of the hallway, between the table and

judge's stand, on the west side of the table, and to Eagan's right; they were all facing towards me; I do not know whether Mr. Eagan heard the remark of Howard James about reloading the pistol or not.

Redirect examination:

The remarks of Howard James about reloading his pistol was uttered in language sufficiently loud to have been heard by Mr. Eagan from the position they occupied.

Cross-examination:

The remark was addressed to me.

*Question*—Is it probable that Mr. Eagan, under the excitement of the occasion, would have heard or paid any attention to the remark as addressed to you unless his attention was there drawn to it?

*Answer*—I do not think he would have heard it unless his attention had been called to it, for he was badly excited at the time.

W. R. Boyd being called and sworn in behalf of the State says: I am a lawyer by profession, and live in the town of Madison; I use as a law office a room under the room used as a court room, the same also being used as a sheriff's office; I was in my office on the morning of the 8th February inst. when Frank Paterson was shot; I was reading at the time; I heard two shots fired in quick succession in the court room above, and considerable commotion of persons moving about, or appeared to be; immediately after the firing of those two shots I heard some person in the room over head speak very loudly, saying, "shoot him again," and another shot was then immediately fired; before the last shot was fired I jumped up out of my seat, threw my book down and went directly to the door of the room I occupied; I think the last shot was fired about the time I jumped up; I am certain it was fired before I got to the door; I was in the act of getting up

when I heard the words " shoot him again ;" the door of my office that I went to is the door that opens to the street on the south side of the building ; when I got to the door I saw several colored men in the street moving towards the entrance that leads to the stairs of the court room ; nearly every one was armed with a stick, and seemed to be considerably excited; I started into Judge Witherspoon's office which was adjoining mine, and met him as he was descending the steps of his office ; he said, " Boyd, run across the street and get a doctor, the first you meet ;" I asked him, " who for ?" he said, " Frank Paterson ;" he said, " he is shot or killed," I forget which, I disremember ; I ran across the street and saw Dr. Sessions, and called to him to come over to the court-house ; I came immediately back ; I passed by a crowd of negroes in front of the court-house, all along in front of the building ; I suppose there must have been between seventy-five and one hundred negroes in front of the building ; some of them had been sitting on my steps ; they jumped up when the firing commenced ; I saw this crowd of negroes as they commenced gathering that morning.

*Question*—Did you see anything in connection with the assembling of the negroes at the court-house that morning before the shooting that attracted your attention ?

*Answer*—I noticed particularly nearly all of them were armed with sticks ; I can swear that I saw Savage in the crowd that morning; I do not know Howard James; I did not see Eagan in the crowd ; I saw him pass the front street, but did not see him go to the court-house.

*Question*—Were any fire-arms exhibited by the people congregated in front of the court-house door, about or near the time of the shooting ?

*Answer*—There were fire-arms exhibited soon after the

shooting; I saw them when I returned from across the street, which was five or ten minutes after the shooting.

*Question*—Who had them, and what was their deportment?

*Answer*—There was a negro woman standing in a wagon about ten or fifteen feet from the court-house, and about twenty-five feet from the court-house entrance, holding in her hands a double-barrel shot-gun, crying out to the negroes, "to go up in to the court-house and take them men and not to let them take them, and not to go up with nothing, but come there and get the gun or guns," I do not know which; she told the negroes to be men and not to be cowards; this she repeated frequently; I went to the wagon and told her to put down the gun; she laid it down across the seat; I saw her immediately with the gun in her hands again exhorting them as before; this woman was Vine Stephens, the wife of Burk Stephens; among other things she said the white men would soon be there with their guns, now is the time; when I first saw her with the gun the sheriff and posse had not gone up stairs, but went up immediately; when the posse came down stairs with the prisoners, and afterwards there were several parties trying to calm the crowd of colored people below, I for one said to those people that the prisoners were in the hands of the law, and let the law take its course; Mr. S. Y. Finley, Judge Witherspoon, Dr. Sessions and Mr. Spradley were among those who made an effort to calm them; after the posse came, and while Finley and others were trying to calm the colored people, or about that time, I observed Mr. Eagan and General Jenkins; if they were endeavoring to calm the crowd I did not observe it; Mr. Eagan remained but a very short time in front of the court-house; Mr. Jenkins and he started off, and the negroes crowded around them, and they went off together; they went off in the

direction of the drug store, which is in the direction of his house, immediately this side of the drug store; I saw him last still surrounded by the negroes; it is about 150 yards from the court-house to where I saw him last; I think there were fifty or sixty negroes went off with Eagan and Jenkins; there might not have been that many; I could not tell what part of the room the words came which I heard, "shoot him again;" my office is under the court room, between the centre and east end of the court room; I am certain the words "shoot him again" was spoken before the last fire.

Cross-examination:

I don't think it was exceeding three seconds between the second and last fire; I heard three reports, and no more; I did not recognize anything else that was said in the room above; I did not recognize the voice; there was not any perceptible excitement among the negroes outside of the court-house before the firing commenced; I did not notice any guns in the hands of the negroes that day, except the shot-gun the woman had; the crowd that went off with Eagan and Jenkins did not display any fire-arms that I saw; I never saw Eagan and Jenkins until immediately after the sheriff came down from the court room with the prisoners; Eagan looked very pale; he did not speak as though he was much excited; he spoke to Jenkins something about going home; was the only words I heard him utter; I am not personally acquainted with Mr. Eagan; my acquaintance with him was not sufficiently so as to recognize his voice.

J. B. Wiginton sworn on the part of the State says: I am a citizen of Madison, Madison county, Fla.; I am a doctor of medicine; I was acquainted with Frank P. Pat_erson in his life time; he is dead; he died the day of the shooting; I was called to see him after he was shot; the

call was as a physician; I found two wounds on his person; one of those wounds was calculated to produce death; it was the one two and a half inches below the right nipple; it was from the effect of this wound he died; the other wound was in the left hand, but was not mortal; I think he lived about one hour after he was shot.

O. F. Florrid sworn on behalf of the State says: I reside in the town of Madison, Madison county, Fla.; I am a merchant; I was in the court room on the morning of the 8th February inst. when Frank Paterson was shot; he was shot by Charles Savage; I am sure there were three shots fired; I was standing up at or near the bar; there was one seat between me and the bar; when the shooting commenced I was about four feet north of the entrance of the bar; when the second shot was fired I had turned around and walked up near where the combatants were; I suppose I was within five or six feet of them when the second shot was fired; immediately after the second fire I heard a voice in the room say, "shoot him again;" this was just before the third fire; I did not see any person in front of me at the time but those three men, Savage, James and Paterson; I don't remember there being any person either on my right or left at the time I heard the voice; I did not recognize the voice; there was such an excitement in the room I cannot tell from what part of the room the sound of voice came; I looked around to see, but could not see or discover from which direction the sound of the voice came; my face was to the east before I looked around; there were some gentlemen behind me at that time, but I cannot call any names, neither do I know how many; I mean in the west end of the room.

*Question*—At the time you heard the words "shoot him again," was Mr. Eagan in the front or on either side of you?

*Answer*—I do not know where Mr. Eagan was at that time.

· *Question*—At the time you heard those words, did you see any one on your right or left, or in front, other than Savage, James and Paterson?

*Answer*—Mr. C. W. Stevens was a little to the rear on my left; I did not see any one else.

I heard the words "shoot him again" distinctly; I am positive I heard the words before the last shot was fired; I am not positive which it was, James or Savage, that fired the last shot; I am certain James had a pistol; I saw it; he snapped it at me; I am under the impression he fired one shot; I am not certain whether it was before or after he snapped at me.

Cross-examination:

At the time I heard the first pistol fire I was standing behind Bench No. 1 at the end of Bench No. 2, outside of the bar, as shown on diagram, at or near the point indicated by the letter F on the diagram; when I first saw Savage, Paterson and James they were about eight and a half feet from the first post towards the door of the court room; there had been but one shot fired when I first saw them; I think it was twelve or fifteen seconds from the time the first shot was fired until that of the second; when the second shot was fired I was on Bench No. 9; at this time Mr. Stevens was to my rear and left; I cannot point to the direct point; when James snapped his pistol at me he was standing near Bench No. 9 east of me; at this time Savage was to James' right a little to his rear; Savage was about No. 15 on the carpet, as well as I remember; I am not positive where Paterson was at this time, but think he had staggered and fell against the post; the second shot had then been fired; the third shot was fired as quick as he could shoot after the second; I had seen Mr. Paterson in

the court-room before the difficulty occurred; he was inside of the bar when I walked in the court room; I had not been in the room more than half a minute before the difficulty occurred; I saw Mr. Paterson when he left the bar; it was but a few seconds after he left the bar before the difficulty occurred; I saw Savage and James in the room as I went in, but cannot say but, but am inclined to think were coming out of the bar, but did not pay any attention to them, and cannot say; when Mr. Paterson left the bar he walked east towards the door; I am not positive where I did see James and Savage, but think I noticed them in the room, but cannot say where; this was before I saw Paterson go out of the bar; everything was quiet when I went in the room; I disremember whether Mr. Eagan was writing or reading when I went into the room; I cannot precisely locate Mr. Eagan's position, but he was on the west side of the table next to the judge's bench, can't say, but think he was sitting; I did not see Mr. Eagan any more after my attention was attracted to the firing in the court room.

Redirect examination:

There was time enough between the second and third shots for me to have heard the words " shoot him again;" at the time I heard the words " shoot him again " there was great excitement and confusion in the room.

C. S. Church sworn on behalf of the State says: I live in Madison county, State of Flórida; I am acting deputy sheriff; I was in the court room on the morning of the 8th February when Frank Paterson was shot; he was shot by .Charles Savage and Howard James, or at least they both shot at him; I saw Howard James shoot at him; I was in ten feet of him when he fired the pistol; there were three shots fired; the last shot was fired by Howard James; the second shot was fired by Charles Savage; between the

second and third shots I heard a voice in the room say, "shoot him again;" I then immediately drew my pistol and said "the man that fires the next shot I would kill him;" Charles Savage and Howard James were in front of me; Frank Paterson was also in my front, but to the left; I do not know who made the remark; I do not know where the words came from; there was time enough between the second and third shots for me to hear the words distinctly; I could not tell where the words came from, for I was watching Savage and James, expecting them to shoot me; I was watching both Savage and James, and had my eye on them, and if either of them spoke it I did not see their lips move; Mr. Densler was near me about that time, and some one else, I do not know who; I was not in the room when Savage and James were arrested by the posse; Savage had went to a window to jump out, and I ran down out of the court-house and around under the window to prevent his escape; I came to the court-house with the posse; I summoned them myself, and brought them to the court room, but I did not go in with the posse for the reason as given above.

Cross-examination:

When the first shot was fired I was standing near the first bench outside of the bar with a back to it; the first shot was fired by Charles Savage; Paterson and Savage were about four or five feet from the door of the court room inside when the first shot was fired; James I suppose was standing ten feet from the door on the right as you come out inside; I cannot be exact about it; he might have been further or nearer; I judge him to have been about that far from the door; when the second shot was fired the parties had struggled and got a little further from the door nearer me, perhaps about the middle of the walk-way or aisle on the carpet; I was about five feet from the post next to the

door, between the post and bar; I will not be exact about it; that was my position when I heard the words " shoot him again ;" James had also got near to me at the time of the second fire ; the whole side of his face was to me; I could see nearly his whole face; I suppose he was between three and five feet from Savage at the second fire, perhaps further ; Savage was not exactly between Paterson and James at the second fire; Paterson was nearer me than Savage was ; I was facing to the east; after the second fire Paterson pulled loose from Savage ; Savage fell to his knees as Paterson pulled loose ; I do not know what time intervened between the second and third shots; I would not judge it to have been over five seconds ; it was a short time ; I saw Mr. Eagan before the difficulty commenced ; he was sitting on the opposite side of the table next to the stand ; Mr. Paterson was armed ; I saw him pull out a pistol out of his pocket after he fell and rose ; he tried to cock it, but did not have sufficient strength to cock it, and did not cock it; the reason I suppose he did not have strength to cock it he was very pale, and one of his fingers was shot ; he could not walk without support; when the first pistol fired Savage had his left arm around Paterson's neck, his hand fast hold of Paterson's left coat collar; Paterson, I think, had his right hand against Savage trying to push loose from him.

Redirect examination:

The firing was all over before Paterson drew his pistol from his pocket ; I did not see any licks or blows passed between the combatants ; when Paterson pulled loose from Savage I think he jerked Savage down, as Savage in the fall fell towards Paterson ; from the position I saw the parties in when I first saw them in the struggle Paterson must have passed James before he encountered Savage.

A. R. Spradley sworn on behalf of the State says : I live

in Madison county, Fla., about twenty-six miles from the court-house; my occupation is that of a farmer; I was in Madison at the court room the morning of the 8th February inst. when Frank Paterson was killed; I came to town that morning to bring a load of cotton and to pay my taxes; I had a letter for Mr. Frank Paterson, and was informed he was at the court-house; went over to see him; I know Howard James, Charles Savage and Dennis Eagan, all three; I saw them all that day; I first saw Savage and James that day on the stair steps leading up into the court room as I was going up to see Mr. Paterson; I had stopped on the platform where the steps turns and was coughing; they (James and Savage) passed me while I was stopping; they were going up into the court room; they were together; I noticed as they turned up the steps from where I was standing coughing Savage had a pistol in his right hand holding it behind him under his coat tail; in about a minute after this I went up to the court room door; I did not go into the court room because I saw Mr. Paterson coming towards me when I got to the door; Mr. Paterson had just left the table in the bar and was coming towards me when I first saw him; I saw Howard James and Charles Savage also at that time; Savage was standing about seven or eight feet inside from the door, and James about ten or twelve feet from the door inside towards the bar; I do not know what they were doing there; they were just standing there; they were near the carpet leading to the door to the left or south side of the carpet; when Mr. Paterson got to where Savage was he (Paterson) had a paper in his hand; I cannot say what was the position of the hands of either James or Savage were at that time; Mr. Paterson held out the paper he had in his hand to Savage and said, "the man that swore to that perjured himself;" Savage blustered out with an oath, "damn you," and about that

time he gathered hold of Paterson and fired a pistol at him ; Savage caught Paterson with the left hand around the neck and by the coat collar; that was when he fired the first shot; he jerked Mr. Paterson back and put the pistol against his breast and fired the second shot; there were three shots fired in all; between the second and third shots I heard some person say, " shoot him again;" those words were spoken in the court room ; I am well acquainted with Dennis Eagan, and have been ten or twelve years ; I was tolerable well acquainted with his voice ; I cannot swear point blank that it was Eagan's voice, but was impressed at the time that it was his voice that uttered the words "shoot him again ;" the voice appeared to come from the direction of the bar ; the third shot was fired immediately after I heard the words ; it was a very short time between the second and third shots ; I reckon I could have counted one, two, three, four between the shots ; I did not go in the court room ; I came down stairs immediately after the firing, and found a large crowd around the door of the court-house, principally colored people, and there appeared to be a good deal of excitement among them; I saw one woman have a double-barrel shot-gun in her hands ; I saw three other guns in a wagon ; one of the guns in the wagon was a double-barrel shot-gun, the others I cannot describe as they were covered up with a shawl ; I only saw the breech of them ; the woman I saw with the gun was standing up in the wagon where the other guns were ; she was telling the men around the wagon to take the guns up stairs and take those men out of there ; I saw the wagon go off from that place when it left; there were forty or fifty went off with the wagon ; Eagan and Jenkins started off and the wagon and crowd followed after them ; they went by Dial's store, which is in the direction of Eagan's place from the court-house ; I saw Eagan and Jenkins as

they came down from the court-room; they remained but
a very short time; they just come down and went right
off; did not remain more than three to five minutes; at
the time they came down there were several persons en-
deavoring to pacify these people; Mr. Beggs and Judge
Witherspoon I recollect, and I also was endeavoring to talk
to several; Mr. Eagan and Jenkins did not make any effort
to quiet the crowd, as I saw they did not stay long enough;
I saw a great many sticks and clubs in the hands of the
colored people around the court-house door; Eagan and
Jenkins were afoot the last I saw of them.

Cross-examination:

I cannot tell exactly how long it was between the first
and second shots; I reckon it was about two or three sec
onds; it was just as quick as it could be, one shot right
after the other; it was about four or five seconds between
the second and third shots; when Savage said to Paterson
" damn you," he gathered Paterson; Paterson done noth-
ing that I saw, except tried to shove him off; I saw Mr.
Eagan before Mr. Paterson came out of the bar; there was
no disturbance in the court-house before this encounter
took place; about the time of the first fire Eagan and all
the rest in the bar got up and advanced towards the door,
or I think so; there might have been some left there; they
were crowding in the aisle, so that I don't know that all
advanced; this was after the first fire; I do not know that
I saw Eagan after the first firing; the last time I saw him
in the court he was about eight or ten feet from the table
outside of the bar; I did not take any particular notice;
the second shot had been fired before he came out of the
bar; I think he started about the time the second shot
fired; I saw Savage when he fired the second shot; I saw
Paterson and this man James and several others around the
scene of the shooting at this time; I was standing on the

left hand side of the door on the outside facing the judge's stand, leaning against the facing of the door; from the beginning of the shooting to its termination did not include a space of time more than seven or eight seconds; it was a very short time after the firing of the first shot; there was much excitement and confusion in the room, but little noise except the shooting; I was somewhat excited of course, but not much; I was not scared; I did not hear any other words that I can recall during the time of the shooting, except the words "shoot him again."

Redirect examination :

I heard other words during the shooting, but I cannot recall them; the words I heard, "shoot him again," were louder than any I heard; when Savage said to Paterson, "damn you," he then gathered Paterson around the neck with his left arm; if Paterson had struck Savage I would have seen it; I was looking right at them; they were close to me.

Mrs. E. A. Miller sworn on the part of the State says: I live near the suburbs of the town of Madison, Fla., about three-quarters of a mile from the court-house; I am the wife of J. L. Miller; my residence is on the route from the Eagan place to town; I reside about one hundred yards from the colored school-house; I was at home on the morning of the 8th February, 1881.

*Question*—If you saw or heard anything that morning at the colored school-house, or near it, that attracted your attention, please state what it was, and as near as you can who were present ?

*Answer*—My attention was attracted to the gathering of a large crowd of negro men at the corner of the school-house next to the road; they continued to gather there, some going up town and back again, and boy on a horse up to town and back again several times; seemed to be acting

as a courier; I did not see any guns at that time; they had sticks and were gesticulating to each other excitedly; I don't think there were less than a hundred in the crowd; I noticed a wagon there and one woman and one man in the wagon; Mr. Eagan and another gentleman came up in a buggy; it could be called a stop he made; he turned his head as if speaking to them, and drove on, and the whole crowd followed him towards town; I noticed particularly that nearly every one had a stick as they moved on towards town; the man and woman that were in the wagon went on with the crowd and carried the wagon with them; I do not know the names of the man and woman that was in the wagon; I think it was ten or eleven o'clock when they left the school-house; I did not notice the time particularly; I know Mr. Eagan well enough to know that it was him in the buggy; I was very much excited after my servant returned from towards the school-house after talking with some of the crowd; this servant is a colored woman; her name is Amelia; you mistook her name in the summons for her; her name was down as Milley; she is still at my residence; I saw Mr. Eagan again that day as he returned in the direction of his place; it was over an hour I expect after I saw him going towards town; I was more excited then because he came with such a crowd, and because of his usual direction towards his place, passing near my gate; there was not less than fifty, nearer one hundred, with him, all colored people, except one white man whom I took to be a United States Marshal; I did not notice any weapons or sticks in that crowd, but noticed the same wagon and the man in it, but the woman I did not notice; there was no other person in the wagon; Mr. Eagan was on foot, with a cigar in his mouth, but it was not lighted; the crowd and wagon were close to Eagan; I did not see any weapons or sticks; the excitement was

high, and I did not notice ; there was a crowd going to the jail ; I did not know at that time that Paterson had been shot ; very soon after Eagan passed towards the school-house ; there was squads of negro men coming in from the direction of the school-house towards town armed with guns ; they came in squads ; I saw a squad of four on horseback, and a squad of three on horseback with arms, and a squad of four on foot with arms, and other single persons with arms ; I don't know how many ; they were moving rapidly and excitedly; it was not a half hour after · Eagan passed out of my sight until I saw the first of the armed colored people; they came the route Eagan went off on ; the bulk of the crowd passed my house with Mr. Eagan going to town, and Judge Tidwell came on in the rear; he had a stick also ; he usually walks with a stick.

Cross-examination :

I did not recognize the negroes that came in squads with arms as those that had gone out with Eagan, for I did not notice them individually, as they went out with him, nor those that came in armed, sufficiently to say whether they were the same or not.

John L. Stewart sworn by the State says : I am a Presbyterian minister of the Gospel ; when at home I reside in Trenton, Ontario, Canada ; on the morning of the 8th February, 1881, I was at Major John L. Miller's ; I left home in Canada the 9th day of December last ; I first came to Jacksonville and remained there two weeks, and then came to Madison. At this point by consent, and the witness being an invalid, the evidence of Mrs. E. A. Miller was read over to witness, and he was asked if the testimony of Mrs. Miller is correct, and if he had heard what was therein stated. To which the witness replied, it is correct up to the time that we got the word that Mr. Paterson was shot ; I then immediately left Major Miller's

to go to Mr. Paterson, and remained with him until he died; it was not more than fifteen minutes after Mr. Eagan passed by Major Miller's on his way towards his place before we heard of the shooting; I saw a few colored people in the morning armed with guns who went up towards town after the gentleman who was pointed out to me as Mr. Eagan; he drove through the crowd and spoke, and the buggy drew up a little, and the crowd filed in after him, and those having arms were with the crowd; I only noticed a few with arms.

Amelia Daniels sworn on behalf of the State says: I live at Major John Miller's; I was living there the day Mr. Paterson was killed; I am cooking for Mrs. Miller; on that morning of that day I saw a crowd of colored people at the colored school-house; that school-house is near Mr. Miller's; I could not do my work, I got so scared; I had to go and tell Mrs. Miller of it; I did not talk with any of them; I did not go out of the house to them; I saw a little boy running by the gate, and he said "the white people had been killing up the black people and they were not going to stand it any longer;" I can't tell how old the boy was; he was a good sizable child; I believe he must have been about thirteen years old; he came right from the school-house; I do not know the name of the boy; I never saw him since; I was cleaning off the breakfast table when this occurred.

Cross-examination:

I can't tell you how high he was; he was a good sizable child; the boy was about four feet high; I had never seen the boy before as I know of; I am hard of hearing, and not so very hard neither; I do not know how old I am; I am not so very old.

D. L. M. Walker sworn on behalf of the State says: I live about one mile from this place on the road leading to

Mr. Eagan's; I was at home working in my garden the day that Mr. Paterson was killed; it is about one mile and a half from my house to Mr. Eagan's; I know Mr. Eagan when I see him; I saw Mr. Eagan that morning as he was coming to town, him and another gentleman in a buggy; they passed my house about eight o'clock; it was pretty early, the sun was not very high; there were several colored footmen and some three or four riding passed with him; I saw him again that day; as near as I can come at it I think it was between eleven and twelve o'clock I saw him; he was going back towards his house; he passed by my house; he was in a two-horse wagon; there was another white man with him, and I suppose between ten and fifteen colored men with him in the wagon; it was about as full as it could get; there was also between 40 and 50 colored men on foot in a run trying to keep up with the wagon; I did not hear any conversation by the parties that were with the wagon; a short time after a colored woman and four or five men came along going the same way towards Mr. Eagan's walking fast; I heard her say that Burk Stephens was too smart for them, they would not get him; she made this remark to the colored men that was with her; she used the remark as they passed by my house; I know Burk Stephens and his wife; it was his wife that made use of the remark I have related; I had not seen that wagon before on that day that I recollect of; I took it to be Dennis Eagan's own wagon; I had seen it frequently before that day passing my house; I did not see any arms with the crowd that went out with Mr. Eagan, but in about twenty-five or thirty minutes after Mr. Eagan passed my place, I suppose there was twelve or fifteen men came back from towards Mr. Eagan's with guns; I took some of them to be some of the same men that was following after the wagon; some of them were riding and some of

them were on foot; they passed by my house and went on towards town; they were walking pretty fast; I do not know where Burk Stephens was living on the 8th February; I know where Burk Stephens lived last year; he was living on a place he contracted with Captain Inglis for, near what is known as the Croom place, about two and a half miles south of town; I suppose the nearest route you could go it would be a mile and a quarter, or a mile and a half, from Eagan's place; in coming from that place to town it would not be the nearest way to come by Eagan's; when the wagon passed my house going towards Eagan's they were going at full speed, between a loap and a run, the footmen could not keep up.

After the preceding testimony had been filed in the Supreme Court, the following witnesses were examined on February 25th, 1881, in open court:

S. Y. Finley, sworn as a witness for the petitioner, testified as follows:

I reside in Jacksonville; name S. Y. Finley; am a lawyer; on the 8th of February, A. D. 1881, was in Madison, Madison county, Florida; was there as counsel for contestee in the contested election case of Bisbee vs. Finley; the proceeding being had was taking testimony before D. Eagan, acting as Notary Public, on Tuesday the 8th February, A. D. 1881; I was taking the testimony at what was called "the old court-house;" on that day one witness had been called by contestant's counsel; I think I had cross-examined him; the taking of testimony up to this time had been going on about 15 or 20 minutes; there were present beside myself General Jenkins, representing Bisbee, and a lawyer named Stevens who was assisting me; the official testimony was being reduced to writing by Mr. Eagan; the room in which testimony was being taken was up

stairs; the position of parties during the taking of the testimony of first witness was about as follows: Mr. Eagan sat with his back to Judge's bench, being between bar-table and bench, with face to the east and towards the door; General Jenkins sat at north side of bar-table to the left of Mr. Eagan; Mr. Stevens and I sat with backs to the door on the east side of the bar-table confronting Mr. Eagan, Stevens on my left; the first witness sat on my right, occupying the relative position to Mr. Eagan that Mr. Stevens and I did to Mr. Eagan; the diagram is correct according to my recollection, except that Mr. Eagan sat a little nearer to the centre of the table; during the examination of this witness I have a very positive impression that Mr. Frank Paterson was in the bar reading a document which I supposed was the testimony in the case taken the day before; Paterson sat at this time, according to my impression, in the rear and rather to the left of Mr. Stevens; the man, Charles Savage, was all about there, in and out of the bar; he (Charles Savage) was, according to my best impression, engaged in no duty; his testimony had been completed in the county the day before; it had been, as I understood, signed up and completed at Eagan's house the night before in the country; as explanation I would state that on the previous day we wrote no testimony except as to examination as to first witness; on the day before we had some talk about inconvenience of meeting at Mr. Eagan's house, the matter was alluded to several times; before adjournment it was agreed that we would meet next morning in town; no particular place was designated; Mr. Stevens, my associate counsel, invited the party to take testimony at his office, saying that he would have a fire, and it would be convenient, but there was no definite place determined upon in town; next morning when Mr. Eagan and General Jen-

kins came to town they went to the court-house, not to Mr.
Stevens' office, and when we found them they were there;
Mr. Stevens and I went around there too; when we got
there we found a great many colored people assembling
there and around there; when we got there we went up
stairs and found 'Mr. Eagan in the court room sitting about
as marked on the diagram; don't know whether General
Jenkins was there then or not, if not he came in soon;
General Jenkins had obtained leave to take testimony
there, and we were proceeding to business; there was some
talk between Mr. Eagan and General Jenkins, some in-
quiry as to how the witnesses were to be gotten up stairs;
it was suggested either by General Jenkins or Mr. Eagan
that somebody be instructed to call witnesses as needed, and
Mr. Eagan suggested Charles Savage as the party to per-
form that duty; he (Savage) was there seeming to take
great interest in the matter; it just happened that way I
think; there was no concert in the matter; I don't know
whether he called the witnesses or not; after the examina-
tion of the first witness I can't say positively whether an-
other was called or not; up to that time the proceeding
was conducted in an orderly, pleasant and a peaceable way;
Mr. Eagan during the examination of this witness was
pleasant and respectful; he discharged his duty quietly;
there was no disorder in the room at this time; at this
time I don't know whether there was any disorder out-
side of the court room or not; the proceeding was inter-
rupted after we had examined the first witness and were
preparing to examine the second witness; there was an in-
terruption and confusion produced by the firing of a pistol;
after hearing this I looked around towards the door and
saw Charles Savage near the door with a bright and glit-
tering pistol in his hand, and another party very close to
him; Savage seemed to be moving his pistol about as

though he was trying to get the range of the other party; did not know who the other party was at the time; I can't say when I first saw them whether they were clinched or not; my attention was mainly directed to Savage and his movements; both of them receded from their first positions near the door coming in the direction of us and the middle of the room; it appeared to me from the relative movements of the parties that Paterson was dodging around, Savage continuing to advance upon and endeavoring to get the range of his pistol upon him until he shot the second time; I think he shot the third time before Paterson fell, which was perhaps near the longitudinal centre of the room; my back was to the door, face to table, when I heard first report of pistol; there was a good deal of confusion, and I was a little excited myself; I hallowed at this man Savage and tried to get him to stop shooting; I cannot repeat exactly what I said; I think I told him to stop shooting, and told the others to stop him; I said this I think between the second and third shots, and I think perhaps afterwards; I think I remained up to third shot within the bar, but think I had walked to the entrance of the bar; up to the time of the third shot I think Mr. Eagan, as well as myself, went to the entrance of the bar; I am not positive as to this; as to Mr. Eagan I don't know whether he had gone out of the bar before the third shot was fired; between the first and third shots I can't swear whether Mr. Eagan said anything or not; my attention was directed to Savage; I can't swear where General Jenkins and Mr. Eagan were relatively during this time; General Jenkins I think was near the bar and inside of it; after the third shot a deputy sheriff came in and confronted Savage and prevented his escape; Mr. Paterson went or was taken down stairs; I can't swear as to the position of Mr. Eagan; after awhile General Jenkins took his position at the end of

the table, and Mr. Eagan I think resumed his position standing up, and something was said as to going on with the testimony; General Jenkins said he was ready to go on; Mr. Eagan said he would adjourn to his house; from the time I commenced to take the testimony to the time Mr. Paterson was taken from the room, I heard Mr. Eagan say or do nothing during the taking of the testimony, nor did I hear him say anything indicating that he had anything to do with the difficulty between Paterson and Savage during the taking of the testimony; after the firing commenced I cannot swear as to what was said or done by Mr. Eagan, because I don't know; Mr. Eagan did not appear to be excited; he was very cool.

Cross-examination:

After the firing commenced my attention was directed to the combatants, particularly to Savage; the first witness' name I think was Wren; after his examination can't say where he went; think he retired; I never saw him after that; Mr. Eagan's position was such that he could have had a full view to the door where the combatants were engaged, unless there was some intervening object, and I know of none; General Jenkins' face was not exactly confronting the door; he could see the door by turning his head without leaving his position; Mr. Eagan was sitting at the table, as I described when Mr. Stevens and I entered the court room; we did not go to work at once; we had a pleasant conversation before commencing; I don't know when Mr. Paterson came in; I have a recollection of his coming in; he was sitting there quietly; would hardly have known he was there; I supposed he was reading the testimony; Savage's appearance caused me to revert to his testimony as to Mr. C. Smith, Forrester and F. Paterson; he stated that Mr. Paterson stood near the polls and would fold two tickets in one and give them out to vote; we were

there taking testimony before Mr. Eagan, a Notary Public, under the act of Congress, in a contested election case; my attention was attracted to Savage on the morning of the 8th on account of remarks that he made the day before; he had said that he expected to be kukluxed or killed; I was impressed that he had no business there that morning; he was acting in a very officious and brave kind of way, and did not appear to be afraid as he had pretended the day before; seeing him there I was reminded of the testimony that he had given the day before in regard to Mr. C. Smith, Frank Paterson and the inspectors; he had testified the day before that on the day of the election Mr. Frank Paterson would stand near the poll or voting place and would fold ballots together and would give them to others to vote; General Jenkins chose Mr. Eagan to take the testimony as a Notary Public; we had had some talk before leaving Jacksonville in regard to taking the testimony at Mr. Eagan's plantation; we also talked about it afterwards; he seemed to regard it more convenient to the witnesses, and for taking care of the witnesses, to take the testimony at Mr. Eagan's plantation; his (Eagan's) house was about two miles from town; I have a good deal of experience in taking testimony in contested election cases; I don't recollect ever taking testimony in such cases at a private house before; yes, sir, Mr. Stevens and I went to the court-house after we heard that Mr. Eagan and General Jenkins had gone there; we had been waiting at Mr. Stevens' office where we thought the testimony would be taken, as Mr. Stevens had tendered it the day before; we had no explanation given us by Messrs. Eagan and Jenkins why they had concluded to take the testimony at the court-house instead of at Mr. Stevens' office; we did not ask an explanation; I do not know whether the second witness had come in the room when the firing disturbed us; I may

have taken the name of the witness preparatory to taking his testimony; he was called I suppose, as there were no white witnesses there that I know of; I am not positive whether this second witness had come in the room; I do not recollect seeing him at all; my attention was entirely directed to Savage; I am not positive that Howard James was in the court room; I know of a man by that name, but do not know him; I do not know of any colored man in the court room but Savage; I cannot swear to any other colored man in the room but Savage; when I saw Deputy Sheriff Church, cannot state how close Paterson and Savage were together when firing commenced; I think there were parties between the bar and combatants before the difficulty ended; I think Mr. Stevens was one; so much confusion I could not tell how long between the firing of the second and third shots, long enough for me to tell Savage to quit or stop shooting, I think; I was trying to stop affray; cannot swear to making use of any particular expression; the time between the first and last shots was long enough for Mr. Paterson in a zigzag way to stagger off from Savage to about the middle of the room; at or after the firing of the third shot Mr. Paterson fell (there might have been four shots); at time of last shot I think Savage was six or seven feet from Paterson, or thereabouts; Savage fired deliberately; don't remember of Mr. Eagan saying anything until the talk was had about resuming the testimony; about the time or after Paterson fell Savage was, as I feel positive and certain, with his face east confronting deputy sheriff, threatening to shoot the deputy sheriff; Savage afterwards sauntered around to where Mr. Eagan was, and between him and the window, north window; a short time after the firing, and after we were shut up in the room, I ordered Savage to surrender to the sheriff; cannot say that Mr. Eagan spoke at all; he was quite cool; I

know of no conversation between him and Savage after the firing; we were all pretty close together behind the bar I think after firing commenced; when I hallowed at Savage I did it aloud so that all present could hear it; no one asked him to surrender as I know of but myself; I did not see any arms among the colored people when we went up in the court room that morning; Savage's expression about "kuklux" and being shot made out at Mr. Eagan's plantation the day before was in the presence of us all; Mr. Eagan made no reply to it that I know of.

Direct examination resumed:

I don't know what Mr. Paterson said; I did not approach him at all; I saw him fall as though he was killed; when the sheriff and his posse came in I got out of the room; I have not read the testimony taken at Madison; I think that Mr. Stevens went to Mr. Paterson after he fell; I cannot testify to anything that Mr. Paterson said.

H. Jenkins, Jr., sworn as a witness for the petitioner, testified as follows:

I am a lawyer, and reside in Jacksonville; I was in Madison on the 8th day of February representing Mr. Bisbee before Dennis Eagan, Notary Public, in the contested election case of Bisbee vs. Finley; I secured the court room by note to the sheriff; I found Mr. Eagan in the court room with Mr. Finley and Mr. Stevens when I went there, near the table at the west end of the room; I proceeded to get ready; Mr. Eagan took his seat on the west side of the table facing towards the door; Mr. Finley and Stevens sat fronting him on the opposite side of the table, Stevens on Finley's left; I was at the north end of the table facing it lengthwise; I asked Eagan to get Savage to call the witnesses as they were wanted; we examined one witness whose name I do not recall; another had been called and taken his seat, and I was about to interrogate him when I

heard a few words in a high tone of voice or voices, and quickly a violent scuffle; I looked and saw two men scuffling together in conflict, very near to the door, and with the utmost rapidity heard two shots in succession; after the second shot was fired one of the parties turned his face towards me, his back had been towards me; I think he began to turn when the first shot was fired, because it struck me he was hit; after the second shot he fell, recovered himself quickly, and went out of my sight, and out of the room; after the firing very soon I saw Finley and Eagan very near the seats they had been occupying; I don't recollect that any one was outside of the bar who had been there before; I remember that Mr. Finley said, " stop !" or " stop there !" or words to that effect; that was as I recollect after the shots were fired; I remained inside of the bar during the shooting; all remained inside of the bar; can't say that I recollect Stevens leaving; during the shooting I think I was about six feet from Eagan; I don't remember being separated from Eagan more than that distance; I did not hear him say anything; if he had spoken in a loud tone of voice I think I could and would have heard him; I did not hear Mr. Eagan during the shooting make any such exclamation as " shoot him again," or anything like it; I don't think it would have been possible for him to have spoken them so as to have been heard in the room below, and I have not heard them; the negroes around the court-house were witnesses; they had been summoned or rather notified to attend; they were quiet; saw nothing otherwise; everything was very quiet and peaceable in the court room; nothing indicated violence in the room or outside prior to the difficulty; after the shooting I saw Savage retreating before a white man who had a pistol in his hand; Savage came back to the west end of the room where we were, talking and explaining about the shooting; some one locked

the door, and for a few moments Eagan and the counsel in the case and the white man I saw Savage retreating before remained in the room until the door was opened by the sheriff; when Savage was retreating he had a pistol in his hand; a posse of armed men were with the sheriff, Hankins, and advanced towards Savage; the sheriff seized and called upon him to surrender, which he seemed reluctant to do; Mr. Eagan turned to me and said, " he should surrender;" I said, " yes," and Eagan told Savage to surrender, asking the sheriff at the same time to protect the prisoner against violence, which the sheriff said he would do, and Savage submitted; Eagan and I followed the posse out of the room and went down into the street; the witnesses and Mr. Finley and others were there gathered around, some were expressing fears for the prisoners, and we moved down towards the jail and the way leading out to Eagan's plantation; there appeared to be a good deal of excitement in town; I saw white men coming out the stores, some with guns; the general look of things indicated trouble; no attacks however were made that I saw; no guns were fired; about this time I spoke to Albert Willard, one of the guards of the prisoners then, though not one of the original posse, he told me then of Patersen's dying condition, or of his being mortally wounded; Eagan and I then went out to the plantation; Savage said, when he came back to the west end of the room, that Paterson had " jumped " him and struck him, and that he had to " shoot him to save his life," or words to that effect; this statement he made immediately after the shooting took place; I did not see the first witness examined in the room at the time the shooting commenced; I did not see him leave the room before the shooting; I do not remember seeing either of the witnesses during that day after the shooting began; they may have been in my presence during that time; I did not know

them personally; besides Savage and James I do not remember seeing any colored person in the room after the difficulty commenced that day; from the commencement of the difficulty to the end of the firing the persons in the room were Eagan, Finley, Stevens, Savage, James, second witness, name not known, Paterson, a man whose name was said to be Church, and that he was a deputy sheriff, and myself; I don't recollect seeing the second witness after my attention was called from his examination to the parties in difficulty; the difficulty started late in the forenoon, I think about eleven o'clock; I had been in the court room about three-quarters of an hour before difficulty commenced; I saw no shot fired; I heard two; I sprung to my feet at the first shot; the relative position of combatants at first shot was thus: Paterson was between myself and Savage, facing Savage with his back towards me; at first shot they were close, can't tell exactly how far apart; at the first shot, when I first saw them, can't say whether Savage had hold of Paterson; can't say whether one had hold of the other; they were in violent motion, and appeared to have hold of each other; I did not see any blow struck by either; I saw no arms in the hands of either at the time of first shot; the second followed first shot almost immediately; I think not more than a second or two intervening; the position of combatants at second shot was about the same; as to the room at first shot Paterson turned partially and quietly towards the end of the room where I was so that I could see his full face, and his manner and motion indicated that the shot had taken effect; at the second shot the parties were not so near together as at first; the distance had increased by Paterson moving backwards; I think they did not have hold of each other at the second shot; they were apart not more than two feet, perhaps three, difficult to tell exact distance from where I was; when second shot fired Pater-

son staggered to the floor; don't think he fell prone; think he recovered before he actually fell upon the floor; at that instant I did not see Howard James; as Paterson staggered and fell to the floor I do not recollect hearing a third shot; I was startled at that time, but not what you would call excited; my attention at that time was drawn particularly to what was going on between the combatants, particularly to Paterson, because I thought he was hit; between firing of second shot and Paterson falling the only words I heard was Mr. Finley's exclamation, which was at the time of the second shot or immediately thereafter, his exclamation was: "Stop! Stop there!" he used the word ".stop" and other words with it; don't remember exactly what they were; with my attention fixed on combatants if there had been a third pistol fired about the time Paterson was falling I think it very probable that it would have attracted my attention; I may have heard it and have forgotten it; I can't recall hearing third shot; I first saw Howard James after firing coming towards west end of room where I was, I think in company with Savage; this was about a minute or a minute and a half after second shot; there was some loud talk between Savage and deputy sheriff before Savage retreated to the end of the room where I was, which lengthened the time of coming back somewhat; it was possibly not more than a minute; can't recall exactly where James was when I first saw him after second firing; I think he came down the aisle with Savage; my best recollection is that James when I first saw him was about half way between my position and where second shot was fired. Witness referring to diagram says: It is possible that James might have been in the aisle and I not have seen him, as my direct line of vision from my·position to the point where the shooting was (as shown by diagram) would not strike the eye; I was north of the aisle; James

was armed when I saw him immediately after the shooting; he had his pistol out; the sort of pistol he had I do not know; it was a revolver; don't know whether it was new or old, or its pattern or make; when Savage and James were coming towards the bar they were very near each other; don't remember which was in front; I think the deputy sheriff had taken his seat between Savage and James and the door; when I saw them approach Savage and James came to the south end of the table, I being at the north; Savage and James were about six or seven feet from Mr. Eagan; I did not hear any conversation between Savage and James and Mr. Eagan at that time; I heard Savage's remark about shooting which seemed to be addressed generally to all of us; during the firing I did not speak; I did not have time to take in the situation, and said nothing; if I did I don't recollect it; during the firing, or at its close, there was in the bar no one else as I recollect except Mr. Finley and Mr. Eagan and myself; I think there was no one between me and the combatants opposite during the firing and up to its close; I did not notice any one inside of the bar between myself and combatants during the firing; after the shooting was over Mr. Eagan and I went down in the street, the posse having preceded us; there were below then about 30 or 40 colored people whom I took to be witnesses; they were considerably excited; the witnesses were brought there at my request to be examined in behalf of contestant in the contested election case of Bisbee vs. Finley; they were the same witnesses I understood who had been notified to and had assembled at Mr. Eagan's plantation for examination the day before, and word of the change was given them when the change was made in the place of taking testimony; I think there were about thirty at Mr. Eagan's the day before; I did not count them; I do not know who was the direct messenger

to summon them; it was understood in Jacksonville that
Savage was to take charge of that matter, and he came up
to Madison when I did for that purpose on Sunday night
the 6th of February, as I recollect; we arrived at Mr. Ea-
gan's plantation at almost five o'clock next morning; don't
think the sun was up when we arrived at Madison; com-
menced taking testimony on the 7th about 11 o'clock, and
continued taking it all day; I examined nobody but Sav-
age that day; when I came out of the court room I did not
notice a wagon; when we got some distance from the
court-house, about 300 yards, I saw wagon in front of Liv-
ingston's store; I remember some of the colored people
asked Mr. Eagan and myself to get into wagon and ride
out to his plantation, which we declined to do, saying we
would walk; I think I saw the same wagon at the place
where we first found the witnesses assembled in the morn-
ing at what I supposed was the edge of the town, some dis-
tance from the court-house; I don't know who had it in
charge when I first saw it; when I saw it the second time
it was in charge of a man who I understood was named
Burk Stephens, a colored woman being with him in the
wagon; Burk Stephens was a witness in the contested elec-
tion case; his wife was not; don't recollect seeing any arms
in the wagon, except one double-barrelled gun; I have an
impression that when I got into the wagon about three-
quarters of a mile out of town, on the way to Mr. Eagan's
plantation, there was a gun in the bottom of the wagon that
interfered with the comfort of my feet; there was but one
in the wagon; can't state positively whether it was a double
or single-barrelled gun; think it was a double-barrelled
gun; the wagon after I got into it went to Mr. Eagan's
plantation, stopped there at the front gate, Mr. Eagan and
I got out, and the wagon was driven off on the road; I
saw it going from the front gate, about 20 or 30 yards, as

we went into the gate; from the statement of Mr. Eagan I know the wagon belonged to Burk Stephens; this statement was made last evening since my testimony taken then I asked him about it; I left Mr. Eagan's plantation to take testimony on the morning of the 8th, betwen 9 and 10 o'clock; at the edge of the town, where I first saw witnesses and the wagon, there were about 50 or 60 persons, all sizes included, men, women and children; I did not notice any excitement among the white people of the town until after the killing of Mr. Paterson; toward the attorneys taking the testimony and the counsel representing the parties everything was pleasant and courteous; previous to shooting I noticed no excitement among the colored people; at the edge of the town where I met the witnesses first in the morning there was a long building which I understood was a school-house; Mr. Eagan spoke to me about getting the building for taking the testimony; when we got nearly to the building I saw the heads of children, and Mr. Eagan remarked there was a school in session there; of the 50 or 60 persons there I can't say how many were women and children; can't say what proportion of them; when the colored people were notified of change of place of examination to town I do not think any place was stated to them; I think the court-house was alluded to as the place in their presence at which the examination might be had; when Mr. Eagan and I drove past the school-house there was hardly any stop; there was some little conversation about the taking of the testimony in town, and the conversation narrated as occurring between Mr. Eagan and myself; I had not given these persons instructions to meet at this particular place, and don't think that Mr. Eagan had; I have been informed that Burk Stephens lives about two miles from Mr. Eagan, on the same road beyond from

town ; I learned the facts as to place of residence of Burk Stephens from Mr. Eagan last evening.

On the 26th day of February the court made an order discharging the petitioner as follows:

The testimony taken in this case having been heretofore submitted to the court by counsel for both the petitioner and the State without argument, and the same having been read by the court, and the matters contained therein having been duly and maturely considered, it seems to the court now here that there is not sufficient evidence to warrant the detention of the said petitioner, Dennis Eagan, in the custody of the sheriff; it is therefore considered and or dered by the court that the said petitioner be and he is discharged from custody, and it is further considered and ordered that the costs herein incurred in the prosecution of this matter be taxed against the State of Florida.